# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 23, 2013 Session

## STATE OF TENNESSEE v. JACQUELINE CRANK

**Appeal from the Criminal Court for Loudon County**
No. 10611 B     E. Eugene Eblen, Judge

---

**No. E2012-01189-CCA-R3-CD - Filed September 26, 2013**

---

Jacqueline Crank ("the Defendant") was convicted after a bench trial of one count of misdemeanor child abuse or neglect. The trial court sentenced the Defendant to eleven months, twenty-nine days, suspended to probation. In this direct appeal, the Defendant challenges the constitutionality of the "spiritual treatment exemption" provision set forth in Tennessee Code Annotated section 39-15-402(c). The Defendant also contends that, if this Court affirms her conviction, this matter must be remanded for a hearing under Tennessee's "Preservation of Religious Freedom" statute, codified at Tennessee Code Annotated section 4-1-407. Upon our thorough review of the record and relevant authority, for the reasons stated herein, we conclude that it is not necessary to address the constitutional issue or to remand this matter. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Gregory P. Isaacs, Knoxville, Tennessee, for the appellant, Jacqueline Crank.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Russell Johnson, District Attorney General; and Frank Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

Catherine Emma Swan, Steamboat Springs, Colorado, and A Wayne Henry, Loudon, Tennessee, for the Amici Curiae Children's Healthcare Is a Legal Duty; Tennessee Chapter of the American Academy of Pediatrics; Tennessee Medical Association; Prevent Child Abuse Tennessee; National Child Protection Training Center; Institute for Science in Medicine; First Star; and Donald N. Duquette.

**OPINION**

**Factual and Procedural Background**

The Defendant was charged with one count of child abuse or neglect related to the 2002 death of her teenage child.[1] See Tenn. Code Ann. § 39-15-401(a) (Supp. 2002). The trial court initially granted the Defendant's motion to dismiss the indictment. The State appealed the dismissal to this Court. This Court reversed the trial court's dismissal of the charges and remanded the case for further proceedings on the reinstated indictment. See State v. Ariel Ben Sherman & Jacqueline P. Crank, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032, at *8 (Tenn. Crim. App. July 12, 2007), perm. app. granted (Tenn. Jan. 28, 2008). This Court's decision was affirmed by the Tennessee Supreme Court. See State v. Sherman, 266 S.W.3d 395, 410 (Tenn. 2008).

On remand, the trial court ruled on additional defense motions that previously had been held in abeyance. Additionally, in 2009, after consideration of some proof presented by the parties, the trial court denied the Defendant's renewed motion to dismiss the indictment again on constitutional grounds but granted the Defendant permission to seek interlocutory review. In June 2009, this Court denied the Defendant's application for interlocutory review. In September 2009, the Tennessee Supreme Court also denied interlocutory review.

During the pendency of the Defendant's request for interlocutory review in 2009, the Tennessee General Assembly passed the "Preservation of Religious Freedom Act." See 2009 Tenn. Pub. Acts ch. 573, § 1. After this Court and the Tennessee Supreme Court denied interlocutory review of her renewed motion to dismiss the indictment, the Defendant attempted to convince the trial court to apply this newly-enacted statute to this prosecution. The trial court concluded that this new statute did not apply in this case.

Subsequently, the Defendant waived her right to a jury trial and stipulated to a bench trial based upon affidavits and prior sworn testimony. We have summarized the proof below.

Dr. Guy Wells, a doctor of chiropractic, testified by affidavit as follows:

[O]n February 11, 2002[,] I had an occasion to examine and x-ray a child identified to me as Jessica Crank. She was brought to my office by her

_____

[1] Ariel Ben Sherman also was charged with child abuse or neglect in connection with the teenage child's death. Mr. Sherman was convicted of this offense, but he died during the pendency of this appeal.

-2-

mother, Jacqueline Crank. A brief exam of the child was given, an x-ray was taken, and based upon the same she was instructed to return on February 18, 2002. Jacqueline Crank, along with the child Jessica Crank and an individual identified as Ariel Sherman, who signed Jessica Crank in as her father, did return on February 18, 2002. Based upon an additional x-ray and examination of Jessica Crank, I informed Jacqueline Crank and Ariel Sherman that I could not treat her and that she needed to be taken to an emergency room immediately. . . . I was able to determine to a reasonable degree of medical certainty that her condition was quite serious and it appeared likely to be some sort of malignancy. Before leaving my office, Jacqueline Crank and Ariel Sherman indicated they would take Jessica Crank to an emergency room.

Later on February 18, 2002, Ariel Sherman called me, identifying himself as Jessica Crank's father, and informed me that he was not taking her to an emergency room but that he had gotten a telephone diagnosis from a Boston doctor of Green Stick Fracture and was taking her to Boston to see the doctor there.

Tracy Gartman, a nurse practitioner practicing in Lenoir City in May 2002, set forth the following in her affidavit:

On May 6, 2002[,] I had occasion to examine a child identified to me as Jessica Crank who presented with a severely swollen left shoulder and appeared to be in severe pain. An x-ray of Jessica Crank's shoulder was taken and I was able to identify bone disintegration and other indications of a serious medical condition requiring immediate treatment.

To that end, these indications on the x-ray were pointed out to her mother, Jacqueline Crank, the significance and seriousness of her medical condition was discussed and she was instructed to take her child, Jessica Crank, immediately to the U. T. Emergency Room. I arranged with a physician at the U. T. Emergency Room to be ready for her arrival for further diagnosis and treatment of her condition. Thereafter, as follow-up to this exam and visit, U. T. was contacted and at that time I discovered that Jacqueline Crank and Jessica Crank had never arrived at the Emergency Room. Based upon this finding, local law enforcement was notified of the above described incident.

Lynette Ladd, an officer with the Lenoir City Police Department, testified by affidavit as follows:

I received a complaint of possible child neglect from Physician's Care, a medical facility located in Loudon County, Tennessee. Based upon the information provided, I began a search for an individual identified as Jessica Crank who I had reason to believe was in need of medical care.

On June 24, 2002[,] I located Jessica Crank at 1805 Wheat Road, Lenoir City, Tennessee which is an address located within Loudon County, Tennessee. Along with Department of Children Services and other law enforcement officials, Jessica Crank was removed from that home and from the custody of Jacqueline Crank and was promptly placed in East Tennessee Children's Hospital in Knoxville, Tennessee.

After a period of time in said facility, Jessica Crank was released back to her mother under hospice care and she died on September 15, 2002.

Dr. Victoria Castaneda, a pediatric oncologist, testified by affidavit as follows:

In the year 2002[,] I was affiliated with East Tennessee Children's Hospital in Knoxville, Tennessee working in the Pediatric Oncology and Hematology Department. In my capacity there I had occasion to examine and provide care and treatment for the minor child Jessica Crank who was diagnosed as suffering from terminal Ewing's Sarcoma. I was aware from her medical records that she was initially taken to see a Doctor of Chiropractic in February 2002 and thereafter in May 2002 to a medical clinic (Physician's Care) in Lenoir City, Tennessee where she was examined by a Nurse Practitioner. I am aware from her medical records that on both occasions the adult or adults present with her were told to immediately take her to an emergency room for treatment.

Jessica Crank, then in the custody of the Department of Human Services, was admitted to East Tennessee Children's Hospital in late June 2002 where she remained undergoing treatment and care until being released under hospice care, eventually succumbing to her cancer on September 15, 2002.

I can state, based upon my training, experience and treatment of Jessica Crank, that her death was a proximate result of Ewing's Sarcoma. A delay in the treatment of her disease results in a more massive tumor and renders the

-4-

patient more symptomatic. While earlier treatment would not likely have resulted in her being cured, it would have helped in dealing with her condition and symptoms and positively impacted the quality of her life.

With prompt treatment beginning in February 2002 the quality and length of her remaining life would have been improved and medical personnel would have been better able to manage her pain and disability.

The Defendant testified that she had two children, Jessica and Israel. She stated that Jessica was twenty-two years old, "living but not here." The Defendant acknowledged that, in her lawyer's "terms," Jessica "would be deceased." In 2002, Jessica was fifteen years old. The Defendant described her daughter as "a very outgoing, athletic, fun loving, responsible young lady. She was a believer in Jesus Christ. Jesus Christ was her Lord, her Savior, her King, her Redeemer."

In 2002, the Defendant "knew that [Jessica] had had a problem with her shoulder." She took Jessica to see a nurse practitioner. According to the Defendant, Jessica's condition "was improving" but, eventually, Jessica developed "a grapefruit size tumor on her shoulder."

The Defendant testified that, for treatment, she

decided to turn to Jesus Christ, my Lord and my Savior, my Healer, Defender for her healing. That being a believer in the Lord, being a believer in this Word, that He was the only Healer. And through that belief we took it in our hands to pray for her, to heal her with prayer, to know that Jesus Christ is the Healer, is the Deliverer.

Accordingly, she and Jessica prayed together and read the scriptures. Jessica also was put on the prayer list of several ministries, and "[t]here were churches, believers, all over, all denominations all over the country praying for her." The Defendant described her faith as "devout Christianity."

The Defendant acknowledged that, at some point, the State took Jessica from the Defendant's home.

The Defendant testified that at Jessica's memorial service the Defendant and others prayed and "laid hands upon her" in an attempt to resurrect her.

On cross-examination, the Defendant acknowledged that she had taken Jessica to doctors on at least two occasions. She stated that, nevertheless, she "turned to Jesus Christ" to heal Jessica from her condition.

On the basis of this proof, the trial court found the Defendant guilty as charged. The trial court sentenced the Defendant to eleven months and twenty-nine days, suspended to unsupervised probation.

In this direct appeal, the Defendant contends that the "spiritual treatment exemption" provision contained in Tennessee Code Annotated section 39-15-402(c) is unconstitutional. The Defendant further posits that, if we conclude that this provision is unconstitutional, we must reverse her conviction and dismiss the charge. Finally, in the alternative, the Defendant contends that, if this Court affirms her conviction, she is entitled to a hearing under Tennessee's "Preservation of Religious Freedom" statute, codified at Tennessee Code Annotated section 4-1-407, to determine if this statute applies to the Defendant in a manner to vitiate her conviction.

## **Analysis**

### *The Statutory Spiritual Treatment Exemption Provision*

In 2002, the year of the instant offense, Tennessee Code Annotated section 39-15-402(c) provided as follows:

> Nothing in this chapter [Tennessee Code Annotated Title 39, Chapter 15, setting forth certain offenses against children, including child abuse and neglect] shall be construed to mean a child is neglected, abused, or abused or neglected in an aggravated manner for the sole reason the child is being provided treatment by spiritual means through prayer alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner thereof in lieu of medical or surgical treatment.

Tenn. Code Ann. § 39-15-402(c) (Supp. 2002).[2]  The Defendant argues that this provision "violates due process as unconstitutionally vague" and that it "violates the Establishment Clause and equal protection guarantees."  The Defendant also contends that, in light of the provision's unconstitutionality, her conviction must be reversed and the charge dismissed.

The State disagrees that the provision is unconstitutionally vague and asserts that, even if it violates the First Amendment, the Defendant is not entitled to relief.  Amici Curiae, in addition to agreeing that the provision is unconstitutionally vague, contend that the provision violates the equal protection rights of children.  They also advocate that the remedy in this case is solely to strike the exemption provision, resulting in our upholding the conviction.

Our research convinces us that this issue is controlled by our supreme court's decision in State v. Murray, 480 S.W.2d 355 (Tenn. 1972).  In Murray, the defendant was charged with violating Tennessee Code Annotated section 39-1957, which made it a felony for a person to dispose of or conceal collateral subject to a security interest with the intention of depriving the secured party of the collateral.  The statute also provided that, "'If the person so disposing of the property shall pay the debt to secure which the security agreement was executed before he is arraigned for trial, he shall not be held liable hereunder.'"  Murray, 480 S.W.2d at 356 (quoting Tenn. Code Ann. § 39-1957).  The defendant filed a motion to quash the indictment on the grounds that the statute was unconstitutional because a resulting conviction "would constitute imprisonment for debt in violation of Article 1, Section 18, of the [Tennessee] Constitution."  Id.  The trial court relied upon the latter statutory language quoted above in finding the statute unconstitutional and dismissing the indictment.

The State appealed.  The Tennessee Supreme Court reversed the trial court and reinstated the charge.  Id. at 357.  Our supreme court first recognized that the "[s]tatutes of this State are severable," id. (citing Tenn. Code Ann. § 1-310), and that "[t]he fact that one provision of a statute is unconstitutional does not affect the validity of other independent provisions."  Id. at 356 (citing State v. Scott, 39 S.W. 1 (Tenn. 1897), State v. Wilson, 80 Tenn. 246 (1883)).  The court then concluded that the portion of the statute held

---

[2] The statute currently provides as follows:

> Nothing in this part shall be construed to mean a child is abused, neglected, or endangered, or abused, neglected or endangered in an aggravated manner, for the sole reason the child is being provided treatment by spiritual means through prayer alone, in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner of the recognized church or religious denomination, in lieu of medical or surgical treatment.

Tenn. Code Ann. § 39-15-402(c) (Supp. 2012).

unconstitutional by the trial court "would not destroy the entire statute because the balance of the statute is capable of being enforced in accordance with the apparent legislative intent." Id. at 357. On this basis, the Tennessee Supreme Court held as follows:

> This Court will not pass on the constitutionality of a statute, *or any part of one*, unless it is absolutely necessary for the determination of the case and of the present rights of the parties to the litigation.
>
> Where, as in this case, to ascertain rights of a party, it was only necessary to decide whether a portion of the statute could be elided if unconstitutional, and actual decision as to constitutionality was not necessary, actual decision as to constitutionality of the paragraph in question should be pretermitted.

Id. (emphasis added) (citations omitted).

We hold that the same result is required in the instant case. Tennessee Code Annotated section 39-15-402, which currently describes the offenses of aggravated child abuse and aggravated child neglect or endangerment, originally was passed in 1989 as part of a major restructuring of our criminal code. See 1989 Tenn. Pub. Acts ch. 591, § 1 ("the Original Act"). The spiritual treatment exemption provision originally was passed by the Tennessee General Assembly in 1994 as an amendment to section 39-15-402. See 1994 Tenn. Pub. Acts ch. 978, § 8 ("the Spiritual Treatment Exemption Act"). Significantly, one of the provisions of the Original Act provides as follows:

> If any provision of this act or the application thereof to any person or circumstance is held invalid, such invalidity shall not affect the other provisions or applications of the act which can be given effect without the invalid provision or application, and to that end the provisions of this act are declared to be severable.

1989 Tenn. Pub. Acts. ch. 591, § 120. Nothing in the Spiritual Treatment Exemption Act purported to impact this severability provision of the Original Act.[3]

---

[3] Although Tennessee Code Annotated section 39-15-402 was amended in 1996 and 1998 (prior to the time at which the instant offense was committed), those amendments also did not purport to impact the severability provision of the Original Act. See 1996 Tenn. Pub. Acts ch. 1069, §§ 1-2; 1998 Tenn. Pub. Acts ch. 1040, §§ 1-4. We note, moreover, that when the General Assembly amended the Spiritual Treatment Exemption Act in 2005, after the instant offense, a severability clause was added. See 2005 Tenn. Pub. Acts ch. 487, §§ 2, 3.

Tennessee Code Annotated section 39-15-401, the provision under which the Defendant was convicted, was also passed in the Original Act.[4] See 1989 Tenn. Pub. Acts ch. 591, § 1. The Defendant has cited us to no authority for the proposition that section -401 was unconstitutional during the period between the time it was enacted and the time at which the Spiritual Treatment Exemption Act was passed. Clearly, then, if we were to hold the Spiritual Treatment Exemption Act unconstitutional, "it would not destroy the entire statute because the balance of the statute is capable of being enforced in accordance with the apparent legislative intent." Murray, 480 S.W.2d at 357.

In short, even if we were to hold the Spiritual Treatment Exemption Act unconstitutional, as urged by both the Defendant and Amici Curiae, such a holding would not impact the Defendant's conviction.[5] Rather, we simply would elide the Spiritual Treatment Exemption Act from the statute, as contemplated by the severability provision of the Original Act. Accordingly, the Defendant's conviction would stand. Therefore, we are bound by Tennessee Supreme Court precedent to consider pretermitted the issue of the constitutionality of the Spiritual Treatment Exemption Act. See id. As a result, the Defendant is entitled to no relief on this basis.[6]

*Applicability of Tennessee Code Annotated Section 4-1-407*

In 2009, the Tennessee General Assembly enacted a statute referred to as the "Preservation of Religious Freedom Act." See 2009 Tenn. Pub. Acts ch. 573, § 1. The statute contains the following provisions:

---

[4] The statute proscribing the offense of which the Defendant was convicted provided as follows: "Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor[.]" Tenn. Code Ann. § 39-15-401(a) (Supp. 2002).

[5] Although the Spiritual Treatment Exemption Act amended Tennessee Code Annotated section 39-15-402, it was also applicable to section 39-15-401(proscribing the offense of which the Defendant was convicted) because it referred to *all* of the statutes in Title 39, Chapter 15 of our criminal code. See Tenn. Code Ann. § 39-15-402(c) (Supp. 2002) ("Nothing in *this chapter* shall be construed . . . .") (emphasis added). Chapter 15 includes section 39-15-401.

[6] Our decision on this issue also accords with our supreme court's directive that, "'under Tennessee law, courts do not decide constitutional questions unless resolution is absolutely necessary for determination of the case and the rights of the parties.'" Dellinger v. State, 279 S.W.3d 282, 290 (Tenn. 2009) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)).

(b) Except as provided in subsection (c), no government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability.

(c) No government entity shall substantially burden a person's free exercise of religion unless it demonstrates that application of the burden to the person is:

(1) Essential to further a compelling governmental interest; and

(2) The least restrictive means of furthering that compelling governmental interest.

Tenn. Code Ann. § 4-1-407 (b), (c) (2011).

Prior to her bench trial, the Defendant sought a ruling from the trial court that Tennessee Code Annotated section 4-1-407 applied to her case and that, therefore, the State could not proceed in its prosecution of her until it demonstrated that the prosecution was (1) "[e]ssential to further a compelling governmental interest" and (2) the "least restrictive means of furthering that compelling governmental interest." Id. As her basis for seeking the application of section -407, the Defendant claimed that the State's prosecution was a burden on her free exercise of religion. The trial court denied the Defendant's motion on the basis that the statute, enacted in 2009, did not apply retroactively to her prosecution, which was commenced in April 2003 on the basis of an offense committed in 2002. The Defendant argues on appeal that the trial court's ruling was in error. The State disagrees.

As pointed out by the State in its brief, our supreme court has declared that "it is a well-settled rule that statutes are to be applied prospectively in the absence of clear legislative intent to the contrary," and that "the absence of express language providing for retroactive application supports the conclusion that the legislature did not expressly intend such an application." Van Tran v. State, 66 S.W.3d 790, 797-98 (Tenn. 2001); see also State v. Odom, 137 S.W.3d 572, 582 (Tenn. 2004) (refusing to apply statute retrospectively where statute was silent as to retrospective application, in part on basis that, "had the legislature intended to depart from the long-established rule that statutes are presumed to apply prospectively, it could have so indicated"). Certainly, the express language of the "Preservation of Religious Freedom" statute includes no indication that the General Assembly intended retroactive application, and the Defendant has cited us to no authority indicating that our legislature did intend retroactive application.

Moreover, our General Assembly *has* made clear that criminal conduct is to be prosecuted according to the statutes in effect at the time of the offense, regardless of subsequent legislation:

> Whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Tenn. Code Ann. § 39-11-112 (1997).[7] The Defendant would have section 4-1-407 applied in such a way as to effect an amendment to section 39-15-401. We reject this application as contrary to the General Assembly's expressed intent.

We recognize, of course, that "statutes that are remedial or procedural in nature may be applied retroactively to causes of action arising before the acts became law and to suits pending when the legislation took effect." State v. Hanners, 235 S.W.3d 609, 612 (Tenn. Crim. App. 2007) (citing In re D.A.H., 142 S.W.3d 267, 273 (Tenn. 2004)). We disagree with the Defendant, however, that section 4-1-407 is merely remedial or procedural, at least if it were interpreted in the manner advanced by the Defendant. Rather, if applied as argued by the Defendant, it may have the effect of completely defeating the State's right to prosecute a criminal offense. Certainly, this result is substantive in nature, and "the long standing legal principle [is] that statutes changing substantive rights will not be given retrospective application." Hays v. Hays, 709 S.W.2d 625, 627 (Tenn. Ct. App. 1986) (citing Saylors v. Riggsbee, 544 S.W.2d 609 (Tenn. 1976)). Accordingly, we hold that the trial court committed no error in refusing to apply section 4-1-407 retroactively. The Defendant is entitled to no relief on this basis.

---

[7] Currently, this statute provides as follows:

> When a penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, the offense, as defined by the statute or act being repealed or amended, committed while the statute or act was in full force and effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Tenn. Code Ann. § 39-11-112 (2010).

## Conclusion

For the reasons set forth above, we affirm the trial court's judgment.


_____
JEFFREY S. BIVINS, JUDGE